UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

2011 NOV 30 PM 11:45

CLERK, US DISTRICT COURT
MIDDLE DIST F
J

MICHAEL STEVEN BRYANT,

Plaintiff,

v.                                    Case No. 3:10-cv-55-J-20JBT

SERGEANT MORGAN, et al.,

Defendants.

_____

### ORDER

### I. Status

Plaintiff, an inmate of the Florida penal system who is proceeding pro se, initiated this case by filing a Civil Rights Complaint (Doc. #1). He is proceeding on an Amended Complaint (Doc. #8) (Amended Complaint). Sergeant Jaime Morgan and Sergeant Michael Joseph are the remaining Defendants. Plaintiff contends the Defendants subjected him to cruel and unusual punishment and were deliberately indifferent in violation of the Eighth Amendment when Defendant Joseph used excessive force and physically assaulted him and when Defendant Morgan failed to intervene and protect Plaintiff when he was being physically assaulted by Defendant Joseph. Plaintiff asserts that the Defendants conspired to violate his civil rights. As relief, Plaintiff seeks nominal, compensatory and punitive damages and injunctive relief.

1

This cause is before the Court on Defendants' Motion to Dismiss or in the Alternative Motion for Summary Judgment (Doc. #71) (hereinafter Motion for Summary Judgment).[1] The Court advised Plaintiff of the provisions of Fed. R. Civ. P. 56, and gave him an opportunity to respond. See the Court's Order (Doc. #13). Plaintiff has responded. See Plaintiff's Reply to Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (Doc. #101) (hereinafter Response).

## II. Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Crawford v. Carroll, 529 F.3d 961, 964 (11th. Cir. 2008) (citing Fed. R. Civ. P. 56(c) and Wilson v. B/E/Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004)).

"The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Allen v. Bd. of Pub. Educ. for Bibb County, 495 F.3d 1306, 1313 (11th Cir. 2007) (citations omitted).

---

[1] The Court will refer to the exhibits appended to the Motion for Summary Judgment as "Ex."

2

> "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324, 106 S.Ct. 2548).[2]

Id. at 1314.

### III. Plaintiff's Allegations

Plaintiff alleges the following facts in his Amended Complaint. On January 12, 2009, at approximately 1:30 a.m., while housed at Columbia Correctional Institution (hereinafter CCI), he was awakened by Defendant Joseph and told to pack his belongings because he was being transferred. Amended Complaint at 8. Plaintiff explained that he was in fear because gang members had attempted to stab him at his last institution. Id. Plaintiff declared a psychiatric emergency and requested to speak to the Captain. Id. Repeated requests to declare a psychiatric emergency were denied, and at approximately 4:30 a.m., Plaintiff was ordered to meet Sergeant Morgan in front of the chow hall. Id. at 8-9. Plaintiff complied with this directive. Id. at 9.

Plaintiff told Defendant Morgan that he was in fear for his life, declared a psychological emergency, and requested to speak

---

[2] Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

3

to the Captain. Id. Defendant Morgan ordered Plaintiff to submit to handcuffs. Id. Plaintiff complied, and Defendant Morgan handcuffed and shackled Plaintiff. Id. Defendant Morgan ordered Plaintiff to walk to the transport van. Id. Plaintiff could not move because he was afraid. Id. Defendant Morgan requested assistance. Id. Defendant Joseph arrived. Id. Defendant Morgan, positioned on Plaintiff's left arm, and Defendant Joseph, positioned on Plaintiff's right arm, began to drag Plaintiff by his arms on the concrete. Id. When Defendant Joseph began to drag Plaintiff, he violently shook Plaintiff and hit Plaintiff on his right side. Id. Defendant Morgan did nothing to prevent Defendant Joseph's actions. Id. Defendant Joseph threw Plaintiff onto the concrete and kicked Plaintiff in his right side. Id. Defendant Morgan attempted to hold Plaintiff up by Plaintiff's left arm; however, Plaintiff spun around and hit the concrete with his face. Id. Plaintiff contends that due to Defendant Joseph's shaking, hitting and kicking him, he suffered severe right shoulder pain, pain on the right side of his body, and he suffered deep bruising to his right arm due to striking the concrete when he was thrown down by Defendant Joseph. Id.

Plaintiff complains he suffered a headache, a bleeding abrasion to his right eye and right knee, and deep lacerations and abrasions to both of his ankles, resulting in scars to his

4

ankles.  Id. at 9-9.5.   He also complains of psychological

trauma.  Id. at 9.5.

### IV. Defendants' Motion for Summary Judgement

The Defendants specifically deny beating Plaintiff or

abusing him in any way and deny failing to intervene to prevent

a beating or abuse.  Specifically, in his declaration, Defendant

Joseph states:

> On January 13, 2009, I was assigned as
> B Dormitory housing officer at Columbia
> C.I., Main Unit. Department records show
> that inmate Bryant was scheduled for
> transfer on that date.  While I do not
> specifically recall waking inmate Bryant
> that morning, it is part of my duties to
> wake up inmates who are being transferred.
> It is my practice to awaken inmates pending
> transfer at approximately 2:30 a.m., at
> which point I tell them to gather their
> property because they are being
> transferred, though no inmate is ever told
> where he is being transferred.  I would not
> have instructed inmate Bryant to meet
> Sergeant Morgan in front of the chow hall
> that morning, because inmates who are being
> released or transferred are instructed to
> report to the visiting park.
>
> Inmate Bryant claims he declared a
> psychological emergency after being
> awakened.  While I do not specifically
> recall the events during wakeup that
> morning, I know that inmate Bryant did not
> declare a psychological emergency to me
> that morning because, had inmate Bryant
> declared such a psychological emergency, I
> would have notified the control room and
> medical and inmate Bryant would have been
> placed in restraints as a precaution and
> escorted to medical by an internal officer
> for evaluation.   I have never failed to
> follow this procedure when an inmate has

5

declared a psychological emergency. Therefore, if inmate Bryant had declared a psychological emergency to me that day, there would be a notation on his chronological medical records indicating he was seen by medical.

Ex. B at 1-2.

Declarant Joseph continued:

At approximately 4:30 a.m., I was working the yard during mass movement, positioned at Center Gate. At that time, open population inmates receiving medication, being transferred, or being released were moving from their dorms to report to either medical or the visiting park. Inmates being moved during this mass movement are not restrained and inmates who are being transferred to another institution are placed in restraints only when they reach the visiting park, prior to boarding the bus. All inmates in a custody status which requires them to be restrained are moved separately at a later time in order to prevent restrained inmates from being assaulted by unrestrained inmates.

From my position at Center Gate, I saw Sergeant Morgan signal to me for assistance in front of the chow hall a short distance away. When I walked to his position[,] Sergeant Morgan informed me that inmate Bryant was not responding to Sergeant Morgan's verbal orders to continue walking to the visiting park. I then gave inmate Bryant another order to continue walking to the visiting park. Inmate Bryant believed that he was going to the chow hall to eat prior to the transfer, but we informed him he was to receive a bagged lunch and should continue on to the visiting park for his transfer. At that point[,] Bryant continued on to the visiting park without incident. Inmate Bryant did not declare a psychological emergency during this interaction and no force was used on inmate

6

Bryant by either myself or Sergeant Morgan.

Id. at 2-3.

Defendant Morgan states, in his declaration,

> On January 13, 2009, at approximately 4:30 a.m., I was working the yard at Columbia, C.I. Annex, positioned in front of the chow hall. At that time, open population inmates receiving medication, being transferred, or being released were moving from their dorms to report to either medical or the visiting park. Inmates being released or transferred must report to the visiting park. Inmates being moved during this mass movement are not restrained and inmates who are being transferred to another institution are placed in restraints only when they reach the visiting park, prior to boarding the bus. All inmates in a custody status which requires them to be restrained are moved separately at a later time in order to prevent restrained inmates from being assaulted by unrestrained inmates.

> On his way from his dorm to the visiting park, inmate Bryant stopped in front of the chow hall and stood still. I could tell that inmate Bryant was being transferred away from the institution because he was holding his property in his hands. I ordered inmate Bryant to continue walking to the visiting park, however, he did not respond to my orders and simply stood in front of the chow hall motionless.

> When inmate Bryant failed to respond to my orders, I signaled to Sergeant Joseph who was working at Center Gate a short distance away. Sergeant Joseph walked to my position and gave inmate Bryant another order to report to the visiting park. Inmate Bryant believed that he was going to the chow hall to eat prior to the transfer, but we informed him he was to receive a bagged lunch and should continue on to the

7

visiting park for his transfer. At that point[,] inmate Bryant continued on to the visiting park without incident. Inmate Bryant did not declare a psychological emergency and no force was used on inmate Bryant by either myself or Sergeant Joseph.

Ex. A at 1-3.

Eugenia Johnson, a correctional employee positioned in the Center Gate Tower, states the following in her declaration:

On January 13, 2009, I was assigned as perimeter security officer at Columbia C.I., Main Unit. At approximately 4:30 a.m., I was working the yard during mass movement, positioned in the Center Gate Tower. At that time, open population inmates receiving medication, being transferred, or being released were moving from their dorms to report to either medical or the visiting park. Inmates being moved during this mass movement are not restrained and inmates who are being transferred to another institution are placed in restraints only when they reach the visiting park, prior to boarding the bus. All inmates in a custody status which requires them to be restrained are moved separately at a later time in order to prevent restrained inmates from being assaulted by unrestrained inmates.

From my position in the Center Gate Tower, I have a clear view of the area in front of the chow hall where inmate Bryant alleges the incident occurred. If the incident had occurred as inmate Bryant claims, with inmate Bryant making a ruckus and being restrained, hit, thrown to the ground, kicked, and dragged toward[s] the visiting park, I would have seen the incident occur. Further, if I had seen such an incident of abuse[,] I would certainly have reported it in accordance with my duties as an employee of the Department of Corrections. I did not see

8

> any incident on January 13, 2009, during
> mass movement as described by inmate
> Bryant. Because I would have reported such
> an incident, the lack of any report from me
> confirms that the incident did not happen.

Ex. G at 1-2.

The record shows that the day before the transfer, January 12, 2009, a medical examination of Plaintiff was conducted by CCI medical staff at 2:45 p.m. Ex. C at 21; Ex. D at 1. Plaintiff was examined again, at the transferee institution, Apalachee Correctional Institution (hereinafter ACI), on January 13, 2009, at 1:00 p.m. Ex. C at 21; Ex. D at 1-2. Plaintiff's temperature, pulse, respiration, and blood pressure were taken. Id. Plaintiff was weighed.[3] Id. Plaintiff presented no current medical, dental, or mental health complaint. Id. It was noted that Plaintiff was oriented as to person, time, place and situation. Ex. D at 2. No sign of skin infection was noted. Id. Under current behavior, cooperative was checked. Id. There were no deformities, evidence of abuse, or trauma/disabilities or other physical limitations marked. Id. Apparently, there was some concern about Plaintiff's blood pressure, as there was a notation to check his blood pressure for two weeks. Id.

On January 15, 2009, at 3:30 p.m., Plaintiff received a Pre-Special Housing Health Assessment. Ex. C at 22. Plaintiff

---

[3] Of note, Plaintiff weighed 225 pounds.

9

offered no medical complaints. Id. Again, Plaintiff's vital signs were taken. Id. It was specifically noted that there were no apparent acute medical/mental health reasons that precluded Plaintiff from being placed in special housing. Id. In addition, Plaintiff's health record was reviewed. Id.

Plaintiff submitted an Inmate Sick-Call Request on January 15, 2009 (time of request 9:00, but no indication of morning or night), claiming he was beaten on January 12, 2008 [sic] at 4:30 a.m. Plaintiff's Exhibit E, attached to the Response. He complained of multiple contusions on his right bicep, shoulder pain, an abrasion/contusion of his right "peri-orbital region," an abrasion on his right knee, multiple abrasions/lacerations of his right and left ankles, and back pain. Id.

On January 18, 2009, at sick call, Plaintiff said: "I need documentation that I was beat because if they send me back to the West Unit I am going to cut somebody."[4] Ex. E at 1. He said he was not identifying the person who did it, but the problem was present since "January 12th year 2008 [sic][.]" Id. Plaintiff's vital signs were taken. Id. Plaintiff's gait was steady. Id. He was able to move his extremities without difficulty and there was no swelling or redness on Plaintiff's right shoulder and back, although Plaintiff alleged shoulder and

---

[4] Security staff was notified of Plaintiff's spoken threat to cut someone. Ex. E at 1.

10

back pain. Id. The nurse noted an old bruise on the right upper arm, an old abrasion on the right ankle, and an old bruise on the left ankle. Id. at 1-2. The nurse recorded that Plaintiff stated the incident occurred at 4:30 a.m., January 12, 2008 [sic]. Id. at 2.

On March 3, 2009, while Plaintiff was confined at Zephyrhills Correctional Institution, he reported to Lieutenant Christopher Patterson an alleged incident occurring at 1:00 a.m. on January 12, 2009. Ex. C at 6. Plaintiff provided the following version of the events. Sergeant Morgan (Sgt. 1) woke him up at 1:00 a.m. and ordered him to pack his property in preparation of being moved. Id. at 6-7. Plaintiff asked to speak to the Captain and declared a psychological emergency. Id. at 7. Plaintiff was told the Captain would come see him. Id. Plaintiff packed his property and sat on his bunk to wait for the Captain. Id. At 4:00 a.m., Plaintiff was told by another Sergeant (Sgt. 2) to exit the dormitory and wait in front of the dining hall for Sergeant Morgan (Sgt. 1). Id. Plaintiff complied, and when Sergeant Morgan arrived, Plaintiff claimed a psychological emergency. Id. Plaintiff was placed in wrist and leg restraints by Sergeant Morgan. Id. Plaintiff was advised that he would be getting on the bus. Id. Plaintiff said he refused, and Sergeant Morgan called, via radio to Sgt. 2, and Sgt. 2 responded to the call. Id. Sergeant Morgan was

11

on Plaintiff's left, and Sgt. 2 was on his right. Id.
Plaintiff claims they shook him, dropped him, and kicked him
until he was able to get up by himself. Id. Plaintiff was
taken to the holding cell at the Annex. Id. An unknown Captain
(Capt. 1) and an unknown Sergeant (Sgt. 3) came to the holding
cell. Id. Plaintiff claimed a psychological emergency to Capt.
1. Id. Due to Plaintiff's agitated state, Capt. 1 informed
Plaintiff that he was not being transferred to ACI, but he was
going to be transferred to Jefferson Correctional Institution
(hereinafter JCI). Id. at 7-8. Plaintiff calmed down after
receiving this news. Id. at 8.

Thereafter, Plaintiff was escorted to a new holding cell
near the Facilities Sally port. Id. An unknown officer (Ofc.
1), noticed Plaintiff's eye, and said, "I just saw you hit your
head against the wall! Stop! Lye [sic] down on your bunk!" Id.
Plaintiff was not hitting his head on the cell wall. Id. He
complied with the order. Id. An unknown female black Captain
(Capt. 2) (Sharon Robinson is the only black female captain at
CCI) came to the holding cell and inquired about Plaintiff's
eye. Id. Plaintiff said he told her it was a self-inflicted
injury done with the handcuffs. Id. Plaintiff explained to
Patterson that he told Capt. 2 this because he did not want any
more trouble. Id. Capt. 2 applied a black box to Plaintiff's
handcuffs and did not take him to medical. Id. When the bus

12

arrived, Plaintiff was placed on the bus and taken to ACI, not JCI. Id. Plaintiff showed Patterson two red marks, one on each of his ankles, stating that the marks were still there and were from the leg restraints that were put on him by Sergeant Morgan (Sgt. 1). Id.

An Incident Report was completed by Lieutenant Patterson on March 3, 2009. Ex. C at 6-14. He conducted an interview of Plaintiff and digital photographs were taken of Plaintiff's ankles. Id. at 6.

The matter was referred to the Office of the Inspector General. Id. Inspector Michael McCord interviewed Plaintiff. Ex. C at 3. Plaintiff provided the following version of the events:

> On January 12, 2009, Inmate Bryant was in Bravo dorm at the main unit. (*This makes more sense than the report by Lt. Patterson as there is no bravo dormitory at the annex.*) He was woke up [sic] by the dorm sergeant and told to pack his property because he was leaving. Because he did not want to be transferred, he declared a psychological emergency but it was ignored. At approximately 4:00 AM, he was told to meet Sergeant Morgan outside the chow hall. Upon meeting Sergeant Morgan as directed, he told him that he is going to have to kill him to put him on that bus and declared a psychological emergency. Sergeant Morgan called the Bravo dormitory sergeant, a large black male sergeant, approximately 6'9, weighing three hundred pounds. Upon his arrival, he started shaking him, he threw him down, causing an abrasion to his eye. He also dragged him to the bus. He had a bruise on his bicep

13

and an abrasion to the right knee from being dragged; Sergeant Morgan is a witness to this. This happened in front of the chow hall, near B1. (*It should be noted that this writer stepped off the distance from the chow hall to bravo dormitory and found it to be 190 paces, approximately 150 yards.*) He went to the annex and told a slim white male captain that he did not want to go to ACI. The captain told him he was going to Jackson. He did not report the incident to the captain. While in the sally port, a large fat white male officer told him he was lucky that he did not get a piece of him. Another unknown white male officer said that he saw him hitting his head against the wall. A black female captain arrived and questioned him about hitting himself. He told the captain he must have scratched it because he had an itch. He does not believe the captain had any idea what had happened. He was transferred to ACI. He reported to Inspector McCord about his numerous attempts to report the incident to staff and Inspector McCord indicated that what took place at ACI will be handled separately. Witnesses are not mentioned.

Id.

A review of the medical documents recorded closest to the incident revealed no injuries or medical complaints. Id. When they were interviewed, Defendants Morgan and Joseph said no abuse or physical confrontation occurred. Id. at 4.

A sworn interview of Plaintiff Bryant was conducted on March 20, 2010, as part of the Inspector General's investigation of the incident. Ex. F. Plaintiff described the physical abuse as follows:

14

A: Midnight shift January 12 09. Yeah January 12th. So he comes out, Sgt[.] Morgan is on my left hand side, my dorm Sgt[.] is on my right hand side. Uh I tell them that I'm not getting on the bus. Well, my man, the man on my right just starts to shake me, rattle me. I ah I'm not moving. He ends up throwing me to the ground.

. . . .

A: Well I mean I was moving when he was shaking me. I was just, I-I just said I can't go back on the bus. I-I uh declared a psych emergency.

Q: Was he pulling you toward the bus?

A: Yes sir. They were dragging me towards the bus.

Q: So both of them were?

A: Not really both ah, I wanna say Sgt. Morgan really wasn't doing much of anything but holding my arm.

Q: Okay.

A: Because I didn't feel any pull or anything. Ah the sergeant on my right was definitely, he's the one who did most of the ah, or all of it in my opinion. He shook me. He threw me to the ground. The reason why I think this is because when I

Q: So he had you with his hand?

A: Yeah he grabbed me with his, his left arm. His left hand and uh he just kinda, he ah he dang near picked me up off my feet you know with just one hand[.]

Q: Big guy?

A: Very big, strong man. And ah he just started shaking me, then he threw me down.

15

And ah the reason why I think Sgt. Morgan didn't really have much to play in this is because when he threw me down I swung, swung to my left and my whole right side of my body hit the ground. And I had an injury to my right eye, an abrasion.

Q: Was it bleeding or anything?

A: Yeah it was, was a little blood coming out.

Q: Cut?

A: Cut.

Q: A Cut or whatever?

A: A cut. It, it was actually an abrasion with a little bruise. That was the most, actually one of the most painful injuries is right there and the hit

Q: What did you hit that on?

A: The ground the con- the asphalt.

Q: So this happened on the asphalt, the sidewalk?

A: Uh, yes sir. Ah I think it was the sidewalk, ah yea, I think it was the asphalt. I think we were moving to

Q: Let me, where did it exactly happen?

A: Right, right when you come in front, stand in front of the chow hall, if you're standing in front of it looking at the chow hall, yeah just to the right, right where it starts. Right where the chow hall starts.

Q: So this is close to B1?

A: Right in front of B1. So if

Q: Okay[.]

> A: Anyone was a witness that they could
> see it from the windows of B1. And ah
> there may be witnesses in there because I
> was making a big ruckus about leaving. I
> said I don't wanna go and I explained why I
> didn't wanna go and ah that I was promised
> that, you know, the psych told me gave me
> his word that I could stay here at this
> camp and he was gonna make me a permanent
> and all this so. There was a lot of
> ruckus, there was a couple of people up
> actually, that that [sic] were awake[.]
>
> Q: Okay, so there could be witnesses in
> in [sic] B1?
>
> A: Most certainly.

Id. at 5-7.

Plaintiff described an injury to his eye; a bruised right
bicep, including a hand print with finger print marks on his
bicep; bruises from his elbow to his shoulder; an abrasion to
his right knee; and a scar on his right ankle. Id. at 7. He
said there were abrasions to his ankles from the shackles. Id.
at 8. He claimed his ankles, his eye and his knee were
bleeding. Id. at 8-9. No one questioned Plaintiff about the
blood when he arrived at the new institution, although Plaintiff
said that he bled through his socks. Id. at 16. Plaintiff
claims he did not complain about the abuse because he wanted his
property back. Id. at 16-17. Plaintiff said he washed his
socks himself and did not turn in the bloody clothing at his new
institution. Id. at 16, 18. Finally, Plaintiff made no

17

complaints about injuries during the pre-confinement physical. Id. at 20.

Upon completion of the investigation, the summary disposition/justification for downgrade/exoneration was based on the fact that there was insufficient evidence to support Plaintiff's allegations, including no video in the area of the alleged incident, no known witnesses, no medical documentation of injury, and both subjects denied the allegations. Ex. C at 1.

## V. Law and Conclusions

The Eleventh Circuit has set forth the standard for an excessive use of force claim for an inmate:

> The use of force constitutes cruel and unusual punishment where it is applied "maliciously and sadistically to cause harm." Skrtich, 280 F.3d at 1300. [5] Thus, in order to prevail on an excessive-force claim, a plaintiff must demonstrate that those who used force against him acted with a malicious purpose. See Johnson v. Breeden, 280 F.3d 1308, 1321 (11th Cir. 2002). In addition, a plaintiff must prove that a requisite amount of force was used against him. Hudson v. McMillian, 503 U.S. 1, 9-10, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Id. (quotation omitted). In determining whether the amount

---

[5] Skrtich v. Thornton, 280 F.3d 1295 (11th Cir. 2002).

18

> of force used against an inmate was <u>de
> minimis</u>, a court may consider the extent of
> the injuries suffered by the inmate.
> <u>Skrtich</u>, 280 F.3d at 1302. Nevertheless, a
> court ultimately should decide an excessive
> force claim "based on the nature of the
> force rather than the extent of the
> injury." <u>Wilkins v. Gaddy</u>, 559 U.S. --, --,
> 130 S.Ct. 1175, 1177, -- L.Ed.2d -- (2010).

<u>Vicks v. Knight</u>, 380 Fed.Appx. 847, 851 (11th Cir. 2010) (per curiam) (not selected for publication in the Federal Reporter).

This Court recognizes that the officer assigned to the Center Gate Tower, Eugenia Johnson, with a clear view of the area in front of the chow hall, did not witness Plaintiff being shaken, hit, thrown to the ground, kicked and dragged towards the buses. Additionally, Plaintiff was examined after his arrival at ACI on January 13, 2009, at 1:00 p.m. No evidence of abuse or trauma was noted. Plaintiff presented no medical complaints. A couple of days later, on January 15, 2009, Plaintiff was seen again and offered no medical complaints. No acute medical reasons were noted to prevent Plaintiff from being placed in special housing. Thus, there were two medical assessments undertaken shortly after the alleged incident, with neither medical assessment supporting Plaintiff's allegations of bleeding, visible, and very significant and recently suffered injuries.

Plaintiff has failed to present this Court with any evidence, other than his own sworn statements, which reiterate

the allegations in his Amended Complaint. As noted by the United States Supreme Court:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). **When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.**

<u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) (emphasis added).

Here, the opposing parties are telling two different stories. If this case were to proceed to trial, apparently Plaintiff would have only the testimony of himself to support his version of the events. His testimony is somewhat contradicted by the medical records that were generated by

20

individuals who are not Defendants in this action, which do not reflect that Plaintiff had any injuries other than an old bruise on his arm and old abrasions/bruises to his ankles. It seems some other injuries would have been visible if Plaintiff had been brutally attacked as he alleges. The Eleventh Circuit recently stated, however, that:

> Although the extent of injury is a relevant factor in determining whether the use of force could plausibly have been thought necessary under the circumstances and may be an indication of the amount of force applied, it is not solely determinative of an Eighth Amendment claim. Wilkins v. Gaddy, ---U.S. ----, 130 S.Ct. 1175, 1178, 175 L.Ed.2d 995 (2010) (per curiam). "An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." Id. at 1178-79. Instead, the focus of the Eighth Amendment inquiry is on the nature of the force applied, rather than the extent of injury inflicted. Id.

Logan v. Smith, No. 11-10695, 2011 WL 3821222, at *2 (11th Cir. 2011) (per curiam)(not selected for publication in the Federal Reporter).

The Court recognizes that in some prisoner cases, when the defendants have refuted the allegations made by the inmate and no other witnesses have corroborated the inmate's version of the events, summary judgment will be granted for the defendants. However, the Court acknowledges that in some excessive force cases the conflicting testimony of the prisoner and the

21

correctional officers will be enough to defeat summary judgment. Although this is a close call, "the record evidence does not flatly contradict [Plaintiff's] allegations[.]" Id.

Out of an abundance of caution, and based on Eleventh Circuit precedent, the Court will decline to grant summary judgment in this case. Since Plaintiff's claim of abuse survives the Motion for Summary Judgment, his claim of failure to protect will also survive the Motion for Summary Judgment:

> a defendant need not participate in the use of excessive force against a prisoner to be held liable under § 1983 for cruel and unusual punishment. Skrtich, 280 F.3d at 1301. A defendant who is present at the scene and fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held personally liable. Id.

Logan, 2011 WL 3821222, at *2.

Finally, Plaintiff concedes that the Defendants are entitled to Eleventh Amendment immunity to the extent that Plaintiff seeks damages against them in their official capacities. Response at 17. See Motion for Summary Judgment at 24.

Therefore, it is now

**ORDERED:**

1.    Plaintiff's August 29, 2011, Objection (Doc. #100) is **DENIED.**    See Order (Doc. #90), Defendants' July 27, 2011,

22

Response to Plaintiff's Motion to Clarify and Define Order (Doc. #99), and Order (Doc. #103).

2. Defendants' January 6, 2011, Motion for Summary Judgment (Doc. #71) is **DENIED**, except with respect to Defendants' assertion that they are entitled to Eleventh Amendment immunity to the extent that Plaintiff seeks damages against them in their official capacities.

**DONE AND ORDERED** at Jacksonville, Florida this 30th day of November, 2011.

UNITED STATES DISTRICT JUDGE

sa 11/28
c:
Michael Steven Bryant
Ass't A.G. (Garland)